G          IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ROLANDO HENDERSON,
        Plaintiff,

vs.                                                   Case No.: 5:08cv283/RS/EMT

DR. CHERRY et al.,
        Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Rolando Henderson ("Henderson") proceeds pro se and in forma pauperis in this action brought pursuant to 42 U.S.C. § 1983.  Presently before the court is a motion for summary judgment filed by Defendants Dr. Cherry and Nurse Vance (Doc. 38).  Henderson responded in opposition to the motion (Doc. 41).  For the reasons stated below, the court recommends that the motion for summary judgment be granted.

I.       BACKGROUND

Henderson, an inmate who was incarcerated at Apalachee Correctional Institution ("ACI") at the time the events at issue in this case took place, initiated this action by filing a civil rights complaint on September 8, 2008 (Doc. 1).  The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive actions. *See* N. D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); and Fed. R. Civ. P. 72(b).  In the Second Amended Complaint (Doc. 17), which is the operative pleading in this case, Henderson names Dr. Cherry and Nurse Vance as Defendants and claims that they violated his Eighth Amendment right to be free from cruel and unusual punishment by denying him adequate medical care for his hand injury (Doc. 17, Statement of Claims).  As relief, he seeks compensatory damages in the amount of $750,000.00 and punitive damages in the amount of $750,000.00 from each Defendant (Doc. 17, Relief Requested).

The court issued a case management and scheduling order setting several deadlines and addressing other case management issues (Doc. 34).[1]  Defendants filed a motion for summary judgment and supporting documents (Docs. 38, 40).  The court advised the parties of the importance and ramifications of Rule 56 summary judgment consideration, informed the parties of the requirements of materials that may be considered on summary judgment, and directed Henderson to respond to the motion for summary judgment (Doc. 39).  Henderson filed a response to the summary judgment motion on October 14, 2009 (Doc. 41).

Upon review of the summary judgment record, it is the opinion of the undersigned that the summary judgment motion filed by Defendants should be granted.

II.     FACTS

The following facts are without substantial controversy.[2]  On Thursday, February 1, 2007, Defendant Vance, a Senior Licensed Practical Nurse ("SLPN Vance"), medically examined Henderson relevant to his complaint of pain in his right hand resulting from an altercation with another inmate (Doc. 17 at 5; Doc. 40-1, Affidavit of Dana Vance ¶¶ 2, 3).  SLPN Vance documented her examination on a Fracture/Sprain Assessment form (Doc. 40-1, Vance Aff. ¶ 3; Doc. 38-2, Ex. B, Fracture/Sprain Assessment).  Henderson complained of a slight throbbing in his

---

[1] The court set the discovery deadline as December 11, 2009, and the dispositive motions deadline as twenty (20) days thereafter (*see* Doc. 34).

[2] The court conveys as facts those factual allegations of Plaintiff's verified Second Amended Complaint (Doc. 17), Defendants' affidavits and other documents in support of their motion for summary judgment (Docs. 38, 40), and Plaintiff's affidavits in support of his response to Defendants' summary judgment motion (Doc. 41), to the extent those facts are undisputed and comply with the requirements for affidavits specified in Rule 56 — that they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see, e.g.,* Dickinson v. Wainwright, 626 F.2d 1184, 1186 (5th Cir. 1980); Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5th Cir. 1980).  The court will not consider as facts Plaintiff's statements in his response to Defendants' motion for summary judgment as they do not comply with the requirements for affidavits specified in Rule 56 (Doc. 41)  Unsworn statements, even from pro se parties, "should not be considered in determining the propriety of summary judgment." Wells v. Cramer, No. 07-10354, 2008 WL 110088, at *3 (11th Cir. Jan. 11, 2008) (unpublished) (quoting Gordon v. Watson, 622 F.2d 120, 123 (5th Cir. 1980)).  Federal law does provide an alternative to making a sworn statement, but requires that the statement include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury.  28 U.S.C. § 1746. Plaintiff's response to Defendants' motion for summary judgment is not sworn and does not include an averment that the statements contained therein are true under the penalties of perjury.  Therefore, the statements of Plaintiff in his response to Defendants' motion for summary judgment will not be considered in resolving the instant motion for summary judgment.  Plaintiff was advised of the Rule 56 requirements by order of this court before he filed his response to Defendants' motion for summary judgment and incorporated statement of undisputed facts (*see* Doc. 39).

right hand in the fourth digit (small finger) (Doc. 40-1, Vance Aff. ¶ 3). SLPN Vance noted that Henderson's fourth digit was slightly swollen and painful to the touch (Doc. 40-1, Vance Aff. ¶ 3; Doc. 38-2, Ex. B, Fracture/Sprain Assessment, Ex. B1, Diagram of Injury). She told Plaintiff, "It seems to be broken." (Doc. 17 at 5). Henderson had a distal pulse in the affected area, which is a positive sign of unimpeded blood flow through the hand (Doc. 40-1, Vance Aff. ¶ 3). Vance advised Henderson to elevate the limb and apply ice to the affected areas to reduce any swelling (*id.*). She additionally advised Henderson that Motrin and Tylenol were available in the dormitories upon request to health care staff, and Henderson was instructed on how to access medical care through the sick call procedures (Doc. 40-1, Vance Aff. ¶¶ 4, 6; Doc. 38-2, Ex. B2, Pre-Special Housing Health Assessment). SLPN Vance detected no obvious fracture or any bone protruding under his skin, and if she had detected such, she would have documented her observations (Doc. 40-1, Vance Aff. ¶ 4). In her medical opinion and based on her observations, she did not believe a splint was warranted at that time (Doc. 40-1, Vance Aff. ¶ 4). To rule out a fracture or sprain, she referred Henderson for x-rays for the following Wednesday, February 7, 2007 (Doc. 40-1, Vance Aff. ¶¶ 3, 4). X-rays are preformed by technicians outside the institution who travel to ACI every Wednesday (Doc. 40-1, Vance Aff. ¶ 3). Once x-rays are completed, the results are provided to the physician or clinician for review (Doc. 40-1, Vance Aff. ¶ 4). In SLPN Vance's examination of Henderson's hand, she detected no physical manifestations that would indicate that his injury was an immediate emergency situation (Doc. 40-1, Vance Aff. ¶ 4). After SLPN Vance's examination, correctional officers handcuffed Henderson, at which time Henderson states he made numerous complaints of pain, but SLPN Vance did not intervene on his behalf (Doc. 17 at 5–6). SLPN Vance states she has no recollection of Henderson's expressing pain or discomfort from being handcuffed, and if he had expressed pain beyond what she noted in her Fracture Sprain Assessment form, she would have documented such and intervened on his behalf for further medical attention (Doc. 40-1, Vance Aff. ¶ 5).

X-rays were performed on Henderson's hand on Wednesday, February 7, 2007, and indicated a fracture of the neck of Henderson's fifth metacarpal (Doc. 38-4, Ex. D, Affidavit of Harold Parker, ¶ 5; Doc. 38-2, Ex. B3, X-ray Request/Report). The x-ray report was received by the ACI medical department on Friday, February 9, 2007 (*see* Doc. 38-2, Ex. B3, X-ray Request/Report). On

Monday, February 12, 2007, Harold Parker, an Advanced Registered Nurse Practitioner ("ARNP Parker"), reviewed Henderson's x-ray report and discussed the findings with Henderson (Doc. 38-4, Parker Aff. ¶ 5, Ex. B4, Chronological Record of Health Care).   Advanced Registered Nurse Practitioners are highly skilled medical providers who are trained and capable of making important medical treatment decisions (Doc. 38-6, Ex. F, Affidavit of Daniel P. Cherry ¶ 4).   During ARNP Parker's examination, Henderson reported only mild pain and no deformity (Doc. 38-4, Parker Aff. ¶ 5; Doc. 38-2, Ex. B4, Chronological Record of Health Care).   Henderson told ARPN Parker that he did not want a splint, which would have immobilized the hand and could have provided relief from any discomfort (Doc. 38-4, Parker Aff. ¶ 5; Doc. 38-2, Ex. B4, Chronological Record of Health Care).   ARPN Parker observed no deformity of Henderson's hand, and his radial, ulnar and medial nerves were intact (Doc. 38-4, Parker Aff. ¶ 5; Doc. 38-2, Ex. B4, Chronological Record of Health Care).   Parker referred Henderson for an orthopedic consultation at the Reception and Medical Center and prescribed him 600 milligrams of Motrin every six hours for any pain he might have (Doc. 38-4, Parker Aff. ¶ 5; Doc. 38-2, Ex. B4, Chronological Record of Health Care).   According to ARNP Parker, Motrin is available to inmates upon request of staff (Doc. 38-4, Parker Aff. ¶ 5). Henderson's medical records do not reflect that he sought medical intervention regarding any pain or discomfort between his initial medical examination on February 1, 2007, and the date he was transported to the Reception and Medical Center (Doc. 38-4, Parker Aff. ¶ 6).

On March 6, 2007, an appointment was made for Henderson to see an orthopedic specialist at the Reception and Medical Center on March 28, 2007 (*see* Doc. 38-2, Ex. B5, Consultation Request/Consultant's Report).   Henderson was seen by Michael J. Lord, an orthopedic surgeon, on March 28, 2007 (Doc. 38-5, Ex. E, Affidavit of Michael J. Lord, ¶¶ 1, 2).   X-rays of Henderson's hand were taken and revealed a healing fracture of the fifth metacarpal with palmer displacement of the head of the metacarpal (Doc. 38-2, B7, X-ray Request/Report).   Henderson complained to Dr. Lord of aching that ran all the way up his arm but primarily located at the fracture site, and he pointed to deformity of his hand (Doc. 38-2, Ex. B8, Consultant's Report).   Dr. Lord observed that Henderson had full range of motion in all joints, there was no sign of tendon imbalance, and the x-rays showed the fracture was healing but not yet completely healed (Doc. 38-5, Lord Aff. ¶ 3; Doc. 38-2, Ex. B8, Consultant's Report).   It was Dr. Lord's medical opinion that under the circumstances

presented by Henderson's fracture, and considering that he had full range of motion in all joints of his hand and exhibited no sign of tendon imbalance, the preferable treatment was to allow the fracture to heal on its own without surgery or other medical intervention or treatment (Doc. 38-5, Lord Aff. ¶ 3; Doc. 38-2, Ex. B8, Consultant's Report).  It was also his opinion that Henderson would be relieved of pain as the fracture completely healed (Doc. 38-2, Ex. B8, Consultant's Report).  Dr. Lord would have rendered the same opinion and recommendation if he had examined Henderson at the time he sustained the fracture (Doc. 38-5, Lord Aff. ¶ 3).

Henderson was transferred back to ACI and sent to the River Junction Work Camp, which is part of the ACI facilities (Doc. 17 at 6).  On April 9, 2007, Henderson filed a formal grievance complaining of the following:

> On 2-1-07 I was placed in confinement for fighting at ACI West Unit.  Nurse Vance looked at my right hand which clearly had a broken bone.  On about the 20th of February, I had x-rays taken and was sent to RMC about 5 weeks after the x-ray, I was shipped to RMC [sic].  Dr. Lord examined my broken hand & x-ray and stated he was not going to do anything for my hand and I was sent back to RJWC.  I am being refused adequate medical care for my hand and need medical to be instructed to take care of this before my hand is permanently damaged.

(Doc. 38, Ex. G2).  Dr. Cherry denied the grievance, stating, "You were seen by the orthopedist and he did not recommend any further care because your fracture was healed in good alignment.  You have been provided appropriate care for your injury." (Doc. 38, Ex. G3).  Henderson appealed Dr. Cherry's response to the Secretary of the Department of Corrections (Doc. 38, Ex. G).  The Secretary's Office responded that Dr. Cherry's response appropriately addressed Henderson's complaint, and it was Dr. Cherry's responsibility to determine the appropriate treatment regimen for his condition (Doc. 38, Ex. G1).  The Secretary's Office advised Henderson to present any concerns or problems to the health care staff through the sick call process (*id.*).

Henderson subsequently saw Dr. Cherry and complained that he was still experiencing excruciating pain and experiencing nerve spasms in his hand (Doc. 17 at 7).  Dr Cherry relied upon and deferred to the orthopedic specialist's recommendations (that is, that no further treatment of the fracture was required and Henderson would be relieved of pain as the fracture healed) (Doc. 38-6, Ex. F, Cherry Aff. ¶ 5).  However, Dr. Cherry responded to Henderson's complaints of pain by discontinuing the prescription for Motrin (prescribed on February 12, 2007 and May 31, 2007), and

substituting a two month supply of 30 milligrams of Anaprox (Doc. 17 at 7; Doc. 38-6, Cherry Aff. ¶ 5 Doc. 38-2, Ex. B22, Physician's Order Sheet). On August 6, 2007, Dr. Cherry prescribed a three month supply of 60 milligrams of Anaprox (Doc. 38-6, Cherry Aff. ¶ 5; Doc. 38-2, B22, Physician's Order Sheet). Dr. Cherry would have taken the same course of action taken by SLPN Vance on February 1, 2007, and ordered x-rays to determine the nature of Henderson's injury (Doc. 38-6, Cherry Aff. ¶ 3). Additionally, he would have taken the same course of action taken by ARNP Parker on February 12, 2007, by reviewing the x-ray results with Henderson, offering a splint, referring him for an orthopedic consultation, and providing 600 milligrams of Motrin, which is an appropriate pain reliever for relief from the degree of pain reported by Henderson (*id.*, ¶ 4). In Dr. Cherry's opinion, an emergency medical situation was not presented under the circumstances (*id.*).

Over one year after his injury, in March of 2008, Henderson filed another formal grievance complaining that Nurse Vance failed to prescribe pain medication when she examined him on February 1, 2007 (*see* Doc. 17, Ex. B-1, Grievance Log Number 0803-102-090). Henderson complained that he was refused adequate medical care from the beginning because he was left in pain and his broken hand was never properly set (*id.*). He complained that his range of motion was permanently "damaged" and he was in constant pain (*id.*). Dr. Cherry denied the grievance on the ground that Henderson was provided care "consistent with clinical findings" (*id.*, Ex. B-3). Cherry stated, "You were referred to a specialist, who diagnosed you with a healed fracture and no further treatment was necessary." (*id.*). Henderson did not appeal Dr. Cherry's response to the Secretary's Office (Doc. 38, Ex. H).

Henderson filed another formal grievance on April 27, 2008, complaining that he was not seen by a doctor until over two weeks from the date he injured his hand, and as a result was suffering extreme pain and a deformed hand (Doc. 17, Ex. B-6, Grievance Log Number 0804-102-113). He requested that his hand be "repaired," even if it meant re-breaking and re-setting the bone (*id.*). Dr. Cherry denied the grievance on the ground that the nature of Henderson's injury did not require an immediate referral to a doctor, and his injury was evaluated by a specialist who confirmed that there was no further treatment required and that the fracture was healing well without deformity (*id.*, Ex. B-8). Henderson did not appeal Dr. Cherry's response to the Secretary's Office (Doc. 38, Ex. H).

As of the date of filing the Second Amended Complaint, Henderson still suffered pain, deformity, nerve spasms, numbness, and a "pins and needles" sensation in his hand (Doc. 17 at 7).

III.    LEGAL STANDARDS

A.    Summary Judgment Standard

In order to prevail on their motions for summary judgment, Defendants must show that Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986). If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. Id. The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he substantive law will identify which facts are material" and which are irrelevant. Anderson, 477 U.S. at 248. An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. See id.; accord Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).

When assessing the sufficiency of the evidence in favor of the nonmoving party, the court must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust Co. v. Fidelity and Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)). The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." Anderson, 477 U.S. at 249–50. "A mere 'scintilla' of evidence supporting the . . . [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting Anderson, 477 U.S. at 252, 106 S. Ct. at 2512). Plaintiff must show more

than the existence of a "metaphysical doubt" regarding the material facts, <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. <u>Celotex Corp.</u>, 477 U. S. at 324 (quoting Fed. R. Civ. P. 56(e)). Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.*; <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997); <u>Hammer v. Slater</u>, 20 F.3d 1137 (11th Cir. 1994). The Eleventh Circuit has consistently held that conclusory allegations without specific supporting facts have no probative value, and are legally insufficient to defeat summary judgment. *See* <u>Leigh v. Warner Bros., Inc.</u>, 212 F.3d 1210, 1217 (11th Cir. 2000); <u>Sammons v. Taylor</u>, 967 F.2d 1533, 1544–45 & n.5 (11th Cir. 1992).

B.     <u>Exhaustion of Administrative Remedies</u>

The Prison Litigation Reform Act, 42 U.S.C. § 1997e (PLRA), provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has stated that this "invigorated" exhaustion requirement is the "centerpiece" of the PLRA. <u>Woodford v. Ngo</u>, 548 U.S. 81, 126 S. Ct. 2378, 2382, 165 L. Ed. 2d 368 (2006). The exhaustion requirement helps to ensure that the "flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." <u>Jones v. Bock</u>, 549 U.S. 199, 203, 127 S. Ct. 910, 914, 166 L. Ed. 2d 798 (2007). It also "attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" <u>Woodford</u>, 548 U.S. at 93 (quoting <u>Porter v. Nussle</u>, 534 U.S. 516, 525, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)) (footnote omitted). The exhaustion requirement is mandatory, and there is no discretion to waive it. <u>Woodford</u>, 126 S. Ct. at 2382; <u>Alexander v. Hawk</u>, 159 F.3d 1321, 1324–26 (11th Cir. 1998).

Additionally, the PLRA exhaustion requirement requires <u>proper</u> exhaustion. <u>Woodford</u>, 548 U.S. at 84, 93. In <u>Woodford</u>, the Supreme Court clarified that proper exhaustion requires that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court. *Id.* at

83–84; *see also* <u>Johnson v. Meadows</u>, 418 F.3d 1152, 1159 (11th Cir. 2005) (holding that § 1997e(a)'s exhaustion requirement contains "a procedural default component"—that is, "[p]risoners must timely meet the deadlines or the good cause standard of Georgia's administrative grievance procedures before filing a federal claim"); <u>Harper v. Jenkin</u>, 179 F.3d 1311, 1312 (11th Cir. 1999) (per curiam) (holding that a prisoner did not exhaust available administrative remedies where he filed an untimely grievance without seeking leave, and failed to appeal the denial of his grievance). Thus, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." <u>Woodford</u>, 548 U.S. at 90–91.

Florida regulations establish a three-step grievance process within state institutions that includes an informal grievance, formal grievance, and appeal to the Office of the Secretary of the DOC. *See* Fla. Admin. Code rr. 33-103.005 to 103.007 (2006). Some types of grievances, including grievances of a medical nature may bypass the informal grievance step. *Id.*, rr. 33-103.006(3), 33-103.008 (2006). Formal grievances must be received by the institution no later than fifteen calendar days from the date on which the incident or action being grieved occurred. *Id.*, r. 33-103.011(1)(b) (2006). However, an extension of time shall be granted when the inmate clearly demonstrates that it was not feasible to file the grievance within the relevant time period and that the inmate made a good faith effort to file in a timely manner. *Id.*, r. 33-103.011(2) (2006). An inmate is entitled to advance to the next step in the grievance process if he does not receive a timely response to a grievance. *See* Fla. Admin. Code r. 33-103.011(4) (2006). Additionally, all informal and formal grievances, except those administrative appeals filed directly with the Office of the Secretary, must be filed at the institution or facility to which the inmate is presently assigned. *Id.*, r. 33-103.015(4) (2006). Therefore, if an inmate wishes to grieve an incident or action that occurred at one institution, but he is transferred to another institution, he must file either informal or formal grievance at the institution in which he is currently housed, and the staff at the inmate's present location must handle the informal or formal grievance. *Id.*

C.    <u>Eighth Amendment Standard</u>

It is well settled that the government has a constitutional duty to provide minimally adequate medical care to prisoners. <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1504 (11th Cir. 1991). Medical

treatment violates the Eighth Amendment "only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* at 1505 (citing Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)).  Incidents of mere negligence or malpractice do not rise to the level of constitutional violations.  *Id.* (citing Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)).

Stating an Eighth Amendment claim of denial of adequate medical care requires satisfying both an objective and subjective component.  Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000).  First, there must be conduct by prison officials which, objectively speaking, is "sufficiently serious" to constitute a deprivation "'denying the minimal civilized measure of life's necessities.'" *Id.* (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (internal quotation omitted)).  Second, the prison officials must possess a subjective intent to use the medical deprivation as a means of punishment.  *Id.* (citations omitted).

Both the objective and subjective components encompass two subsidiary requirements. Taylor, 221 F.3d at 1258.  As to the objective prong, an objectively serious deprivation requires showing an objectively "serious medical need."  Estelle, 429 U.S. at 104.  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1186 (11th Cir. 1994), *abrogated on other grounds by* Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); *see* Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm.").  In addition, an objectively serious deprivation requires showing the response made by Defendants to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain."  Estelle, 429 U.S. at 105–06 (internal quotation marks omitted); *see* Taylor, 221 F.3d at 1257; *see also* Adams v. Poag, 61 F.3d 1537, 1543–44 (11th Cir. 1995).

To show the required subjective intent to punish, Plaintiff must demonstrate that Defendants acted with an attitude of "deliberate indifference."  Estelle, 429 U.S. at 105.  "Deliberate indifference has three components:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  Farrow v. West, 320 F.3d 1235,

1245–46 (11th Cir. 2003) (citing <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999) and <u>Taylor</u>, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need")).

A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. <u>Harris v. Coweta County</u>, 21 F.3d 388, 393 (11th Cir. 1994). However, where the inmate has received medical treatment, and the dispute is over the adequacy of that treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. <u>Harris</u>, 941 F.2d at 1507 (quoting <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1035 (11th Cir. 1989)). To do otherwise would be "to constitutionalize claims that sound in tort law." <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted).

D.      <u>Supervisory Liability</u>

Supervisory officials are not liable under section 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. *See* <u>Cottone v. Jenne</u>, 362 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citations omitted). Supervisory liability may occur, however, either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. *Id.* (citation omitted). This connection may be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so, or when a supervisor's custom or policy 'result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Id.* (internal quotation marks and citations omitted); <u>Wayne v. Jarvis</u>, 197 F.3d 1098, 1105 (11th Cir. 1999).

Isolated incidents are generally insufficient to establish a supervisor's liability; indeed, the deprivations must be "'obvious, flagrant, rampant and of continued duration . . . .'" <u>Gray ex rel. Alexander v. Bostic</u>, 458 F.3d 1295, 1308 (11th Cir. 2006) (quoting <u>Hartley v. Parnell</u>, 193 F.3d 1263, 1269 (11th Cir. 1999)). Furthermore, filing a grievance with a supervisory person does not alone make the supervisor liable for the allegedly violative conduct brought to light by the

grievance, even if the grievance is denied. <u>Wayne</u>, 197 F.3d at 1106; <u>Weaver v. Toombs</u>, 756 F. Supp. 335, 337 (W.D. Mich. 1989), *aff'd*, 915 F.2d 1574 (6th Cir. 1990); *see also* <u>Bellamy v. Bradley</u>, 729 F.2d 416, 421 (6th Cir. 1984). Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." <u>Tittle v. Jefferson County Com'n</u>, 10 F.3d 1535, 1542 (11th Cir. 1994). The failure to act or implement policy must be in the face of repeated violations or other indicators signifying a strong likelihood that the situation will recur. *See* <u>Harris v. City of Marion</u>, 79 F.3d 56, 58–59 (7th Cir. 1996). Supervisors are generally entitled to rely on their subordinates to respond appropriately to situations absent clear or widespread evidence to the contrary. "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." <u>Cottone</u>, 362 F.3d at 1360 (internal quotation marks and citation omitted).

  E. <u>Eleventh Amendment Immunity</u>

  The Eleventh Amendment is an absolute bar to suit for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities. <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989); <u>Edelman v. Jordan</u>, 415 U.S. 651, 662–63, 94 S. Ct. 1347, 1355–56, 39 L. Ed. 2d 662 (1974). Absent waiver or express congressional abrogation, neither of which is present in this case, the Eleventh Amendment prohibits a suit against a state in federal court. <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 n. 14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985). Florida has not waived its Eleventh Amendment immunity from suit in federal court. *See* Fla. Stat. § 768.28(17). Furthermore, Congress did not intend to abrogate a state's Eleventh Amendment immunity in § 1983 damage suits. <u>Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation</u>, 49 F.3d 1490 (11th Cir. 1995). Florida has not waived its sovereign immunity or consented to be sued in damage suits brought pursuant to § 1983. *See* <u>Gamble v. Fla. Dep't of Health & Rehabilitative Servs.</u>, 779 F.2d 1509, 1513 (11th Cir. 1986).

  F. <u>Qualified Immunity</u>

  The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).[3]   This doctrine is intended to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, --- U.S. ----, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

In Saucier v. Katz, the Supreme Court mandated a two-step process for lower courts to follow in resolving qualified immunity claims. 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). First, the court had to decide whether the facts that the plaintiff alleged showed a violation of a constitutional right. *Id.* Second, if the plaintiff satisfied the first step, the court had to determine whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson, 129 S. Ct. at 816 (quoting Saucier, 533 U.S. at 201, 121 S. Ct. 2151).

The Supreme Court revisited Saucier's mandatory two-step inquiry in Pearson. *Id.*, 129 S. Ct. at 815–18. The Court held that while the Saucier process is often appropriate, "it should no longer be regarded as mandatory"; rather, "[t]he judges of the district courts and the court of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818.

IV.    DISCUSSION

Henderson contends SLPN Vance was deliberately indifferent to his medical needs on February 1, 2007, by failing to immediately refer him to Dr. Cherry or send him to a local hospital for x-rays or examination by a doctor, failing to splint his hand, failing to provide him with pain medication, and failing to intervene when he was handcuffed by security officers (Doc. 17 at 5–6, 9–10). Henderson contends Dr. Cherry was deliberately indifferent to his medical needs by creating a policy of delaying medical treatment for inmates with broken bones (*id.* at 6–10). Henderson also

---

[3] The parties do not dispute that SLPN Vance and Dr. Cherry were government officials performing discretionary duties within the scope of their employment.

claims that Dr. Cherry's failure to provide any treatment besides a prescription for Anaprox upon Henderson's return from the Reception and Medical Center constituted deliberate indifference (*id.*).

Defendants contend that although Henderson exhausted his administrative remedies on the issue of what he considered to be proper medical treatment for his hand injury, he raised no issues concerning the specific acts of SLPN Vance of which he now complains, and he raised no issue of Dr. Cherry's being responsible for a policy of delay in medical treatment for broken bones (Doc. 38 at 4–5).

Viewing the evidence in the light most favorable to Henderson, the court concludes that Defendants have met their initial summary judgment burden as to Henderson's failure to exhaust his claims that SLPN Vance failed to intervene when he was handcuffed by security officers, and that Dr. Cherry created a policy of delaying medical treatment for inmates with broken bones. It is undisputed that Henderson filed a formal grievance, Grievance Log Number 0704-102-094, dated April 9, 2007, stating the following:

> On 2-1-07 I was placed in confinement for fighting at ACI West Unit. Nurse Vance looked at my right hand which clearly had a broken bone. On about the 20th of February, I had x-rays taken and was sent to RMC about 5 weeks after the x-ray, I was shipped to RMC [sic]. Dr. Lord examined my broken hand & x-ray and stated he was not going to do anything for my hand and I was sent back to RJWC. I am being refused adequate medical care for my hand and need medical to be instructed to take care of this before my hand is permanently damaged.

(Doc. 17, Ex. B-4; Doc. 38, Ex. G2). Dr. Cherry denied the grievance, stating, "You were seen by the orthopedist and he did not recommend any further care because your fracture was healed in good alignment. You have been provided appropriate care for your injury." (Doc. 17, Ex. B-5; Doc. 38, Ex. G3).

Henderson appealed Dr. Cherry's response to the Secretary of the Department of Corrections, Grievance Log Number 07-6-12088, dated May 7, 2007, stating the following:

> I am appealing the denial of the attached grievance #0704-102-094. As stated in the formal grievance, I have not received proper medical treatment for my broken hand. It has been allowed to heal unaligned and is still in pain. I disagree with the response to my formal grievance in that the orthopedist at Lake Butler told me that he didn't want to re-break by hand and set it properly because it had already started to fuse together but was and still is out of alignment. I can not properly use my right hand to this day as a result of the inadequate and time delayed treatment I have

discussed.  In addition, I am receiving no pain medication for the pain of a broken bone.  You can clearly see the broken bone & tissue build up as a result from [sic] the initial break even now.  I am requesting that you instruct the institution to reevaluate the situation with medical and correct my treatment for the broken bone in my hand to prevent any further longer term problems with my use of my right hand.  I fear there may also be some nerve damage from the initial break and is worsening as a result of the inadequate treatment.

(Doc. 17, Ex. B-9; Doc. 38, Ex. G).  The Secretary's Office responded that Dr. Cherry's response appropriately addressed Henderson's complaint, and it was Dr. Cherry's responsibility to determine the appropriate treatment regimen for his condition (Doc. 17, Ex. B-10; Doc. 38, Ex. G1).  The Secretary's Office advised Henderson to present any concerns or problems to the health care staff through the sick call process (*id.*).

Defendants submitted an affidavit from Rebecca Padgham, an employee of the Department of Corrections, Bureau of Inmate Grievance Appeals stating that although Henderson filed additional formal grievances concerning medical treatment for his hand, Grievance Log Numbers 0803-102-090 and 0804-102-113, he did not file any appeal of the denial of either of those grievances (Doc. 38-8, Ex. H, Affidavit of Rebecca Padgham).

Reviewing the grievances submitted by Henderson, the undersigned concludes that the only claim presented in the Second Amended Complaint that Henderson arguably properly exhausted (by presenting it in both the formal grievance and the appeal to the Secretary's Office) was Dr. Cherry's (by virtue of his position as Chief Health Officer and head of the ACI medical department) failure to provide any treatment, including pain medication, upon Henderson's return to ACI from the Reception and Medical Center, and SLPN Vance's failure to immediately refer him to Dr. Cherry or send him to a local hospital for x-rays or examination by a doctor, failure to splint his hand, and failure to provide pain medication.

However, Defendants met their initial summary judgment burden of showing that Henderson did not properly exhaust his claims that Nurse Vance failed to intervene when he was handcuffed by security officers, or his claim that Dr. Cherry created a policy of delaying medical treatment for inmates with broken bones.  As to those claims, Henderson was required to come forward with evidentiary material demonstrating a genuine issue of fact for trial as to the exhaustion issue. Celotex Corp., 477 U.S. at 322–23.  Henderson has failed to satisfy this burden.  In his response to

Defendants' motion for summary judgment, Henderson argues that the fact that he mentioned Nurse Vance's name in Grievance Log Number 0704-102-094, is sufficient to exhaust his claims against her (Doc. 41 at 1). However, that grievance merely states that Nurse Vance "looked at my right hand which clearly had a broken bone." Neither the formal grievance nor the appeal of that grievance to the Secretary's Office made any mention of a medical issue associated with his being handcuffed, nor did either grievance provide notice to the Department of Corrections of Nurse Vance's alleged medical deprivation by failing to intervene when he was handcuffed. Likewise, although the formal grievance, Grievance Log Number 0704-102-094, and the appeal of the denial of that grievance alleged that the medical staff at ACI failed to adequately treat his broken hand and the pain associated with it, and medical staff delayed treatment for it, neither grievance made any mention of an alleged medical policy at ACI whereby members of the staff were not to provide immediate medical treatment for inmates with broken bones.

Henderson also states that it is clear from the grievances he submitted with his Second Amended Complaint that he filed numerous grievances regarding Dr. Cherry and Nurse Vance's failure to provide treatment for his hand (Doc. 41 at 1–2). However, none of the materials which are properly considered under Rule 56, including the grievances submitted by Henderson, demonstrate that he appealed any formal grievances to the Secretary's Office except Grievance Log Number 0704-102-094, which is discussed *supra*. Accordingly, Defendants are entitled to summary judgment in their favor on Henderson's claims that Nurse Vance failed to intervene when he was handcuffed by security officers, and that Dr. Cherry created a policy of delaying medical treatment for inmates with broken bones, based upon Henderson's failure to exhaust his administrative remedies with regard to these claims.

The undersigned will now determine whether Defendants are entitled to summary judgment on Henderson's exhausted claims, namely, that SLPN Vance failed to immediately refer him for x-rays or examination by a doctor, failed to splint his hand, and failed to provide pain medication, and that Dr. Cherry failed to provide any treatment, including pain medication, upon Henderson's return to ACI from the Reception and Medical Center. Viewing the evidence in the light most favorable to Henderson, as it must, *see* Hairston, 9 F.3d at 918, the court concludes that Defendants have met their initial summary judgment burden because they have successfully negated an essential element

of Henderson's Eighth Amendment claims, that is, that they were deliberately indifferent to his medical need.[4]  *See* <u>Celotex Corp.</u>, 477 U.S. at 322–23; <u>Taylor v. Adams</u>, 221 F.3d at 1257 (identifying subjective element of Eighth Amendment claim of inadequate medical treatment as requiring inmate to demonstrate that prison officials possessed the subjective intent to use the medical deprivation as means of punishment).  The crux of Henderson's claim is that he would not have suffered pain, deformity, nerve spasms, numbness, and a "pins and needles" sensation in his hand if Defendant Vance had immediately referred him to a doctor or for x-rays and offered him a splint (*see* Doc. 41 at 4, 12, 14–15).  A delay in providing medical treatment can constitute deliberate indifference.  <u>Estelle</u>, 429 U.S. at 104–05.  However, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." <u>Townsend v. Jefferson County</u>, 582 F.3d 1252, 1259 (11th Cir. 2009).  In the instant case, Defendants submitted medical evidence in the form of an affidavit from Dr. Lord showing that Henderson suffered no detrimental effect of any alleged delay or inadequacies in SLPN Vance's treatment of his hand.  Dr. Lord states that under the circumstances presented by Henderson's fracture, and considering that he had full range of motion in all joints of his hand and exhibited no sign of tendon imbalance, the preferable treatment was to allow the fracture to heal on its own without surgery or other medical intervention, and this opinion and recommendation would have been the same if Dr. Lord had examined Henderson at the time he sustained the fracture.  Henderson has not submitted any medical evidence that the injury to his hand could have been fixed if he had been immediately

---

[4] The undersigned assumes, without deciding, that Henderson's hand injury qualified as a serious medical need. *Compare* <u>Brown v. Hughes</u>, 894 F.2d 1533, 1538 (11th Cir. 1990) (defendants did not dispute that broken foot can be a serious and painful injury) *and* <u>Hughes v. Noble</u>, 295 F.2d 495, 496 (5th Cir. 1961) (finding that complaint stated § 1983 claim where plaintiff alleged he was held in jail cell and not provided medical treatment for approximately thirteen hours, "despite his repeated requests for medical attention and severe pain" for injuries ultimately diagnosed "as two dislocated and one fractured cervical vertebrae") *and* <u>Lepper v. Nguyen</u>, No. 09-14453, 2010 WL 675709, at *3 (11th Cir. Feb. 26, 2010) (hand injury which showed discoloration, deformity, mild swelling, numbness, and crepitus ("a peculiar crackling, crinkly, or grating feeling or sound under the skin . . . or in the joints") "certainly qualified" as an objectively serious medical need) (unpublished) *and* <u>Minton v. Spann</u>, No. 5:05cv89/RS/WCS, 2007 WL 1099114, at *16 (N.D. Fla. Apr. 10, 2007) (a broken bone is a serious medical need) *with* <u>Webb v. Langly</u>, No. 07-13936, 2008 WL 598284, at *1 (11th Cir. Mar. 6, 2008) (affirming district court's conclusions that substantial delay in providing surgery for fractured nose did not pose a serious medical need, and no defendant acted with the requisite deliberate indifference to establish a constitutional violation) (unpublished).

seen by a doctor and received x-rays and a splint, or that his injury would have been less severe if his medical treatment had been different. Therefore, viewing the facts in the light most favorable to Henderson, Defendants have shown that SLPN Vance was not deliberately indifferent to Henderson's serious medical need. It follows that Henderson's supervisory liability claim against Dr. Cherry as SLPN Vance's supervisor, to the extent he asserts one, fails because Henderson has not shown a constitutional violation by the person under Dr. Cherry's supervision or control. *See* Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1308 (11th Cir. 2009) (recognizing that a supervisor may be liable under § 1983 for the unconstitutional acts of his subordinates if (1) he personally participates in the constitutional violation, or (2) a causal connection exists between his conduct and the constitutional violation, but stating that "claims under a theory of supervisory liability fail [if] the underlying § 1983 claims fail").

To the extent Henderson claims that Dr. Cherry personally participated in the alleged deprivation of medical care by failing to treat his hand when he returned to ACI from the Reception and Medical Center, the undersigned concludes that Defendants have successfully shown that Dr. Cherry was not deliberately indifferent to Henderson's medical need. The undisputed medical evidence shows that Dr. Lord, the orthopedic specialist, recommended no surgery or other medical intervention with regard to Henderson's hand. Dr. Cherry states he relied upon and deferred to the orthopedic specialist's recommendations. Dr. Cherry's reliance on the specialist's recommendation was entirely reasonable and negates Henderson's claim that his response was so deficient as to constitute an unnecessary and wanton infliction of pain. Therefore, Henderson has failed to show an Eighth Amendment violation with regard to Dr. Cherry's failure to provide medical treatment for his hand injury upon his return to ACI.

As to Henderson's contentions that Defendants deprived him of pain medication, Defendants have met their summary judgment burden of showing that they were not deliberately indifferent to his complaints of pain. The undisputed facts show that although SLPN Vance did not personally provide Henderson with pain medication, she advised him of the availability of Motrin and Tylenol in the dormitories. In response to Defendants' motion for summary judgment, Henderson submitted affidavits from himself and other inmates stating that correctional officers in the confinement unit, where he was housed, refused to provide Tylenol to inmates when they requested it (Doc. 41,

attached Affidavit of Rolando Henderson, Affidavit of Michael Minton, Affidavit of Steven Baer, Affidavit of Danior G. Ruben).  Additionally, Henderson's affidavit states that when he complained of pain to nurses each morning during their "sick call rounds" in the confinement unit, they told him to obtain Tylenol from the correctional officers.  However, none of this evidence suggests that SLPN Vance knew that Tylenol or Motrin was unavailable to inmates in confinement.  Additionally, it is undisputed that Henderson's medical records do not show he sought any medical intervention regarding pain or discomfort by utilizing the sick call procedure between his initial medical examination on February 1, 2007, and the date he was transported to the Reception and Medical Center in March of 2007.  Therefore, SLPN Vance is entitled to summary judgment on Henderson's claim that she failed to provide him with pain medication.

Regarding Dr. Cherry's alleged deliberate indifference to Henderson's need for pain medication upon his return to ACI from the Reception and Medical Center, the undisputed medical evidence shows that in June of 2007, when Henderson complained of pain to Dr. Cherry, Dr. Cherry changed his pain medication from Motrin to Anaprox.  Additionally, in August of 2007, Dr. Cherry doubled the dosage of Anaprox to 60 milligrams.  Although Henderson filed grievances several months later, in March and April of 2008, complaining of pain and deformity in his hand due to the allegedly inadequate medical treatment he received since his original injury, his medical records reflect that he did not access the sick call process, the institutional procedure for obtaining medical care, to obtain medical attention for pain in his hand, and Henderson has not come forward with any evidence that he attempted to do so.  Therefore, Dr. Cherry is entitled to summary judgment on Henderson's claim of deliberate indifference to his pain.

V.    CONCLUSION

Upon consideration of Henderson's Eighth Amendment claims and the evidence submitted, the court recommends that Defendants' motion for summary judgment be granted for the reasons set forth above.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That Defendants' motion for summary judgment (Doc. 38) be **GRANTED**.

2.    That Plaintiff's claims of Eighth Amendment violations based upon Defendant Vance's failure intervene when he was handcuffed by security officers, and Dr. Cherry's creating

a policy of delaying medical treatment for inmates with broken bones, be **DISMISSED without prejudice** for failure to exhaust administrative remedies.

       3.       That Plaintiff's remaining Eighth Amendment claims of inadequate medical treatment by Defendants be **DISMISSED with prejudice**.

       4.       That the clerk be directed to enter final judgment accordingly and close the file.

At Pensacola, Florida this 16th day of March 2010.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

      **Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only</u>.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**